IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 2, 2025 Session

## DARRIN NUMBERS ET AL. v. ROBERT SNYDER ET AL.

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2020-CV-755      Adrienne Gilliam Fry, Judge**

___

### No. M2025-00407-COA-R3-CV

___

The plaintiffs in this case are two individuals who transferred a substantial amount of money to a business. After the business failed to repay the plaintiffs, they filed a lawsuit against the business and its owner, alleging various wrongdoings and seeking to pierce the corporate veil of the business. The trial court determined that the plaintiffs had proven all of their claims and awarded compensatory and punitive damages against both the business and its owner. On appeal, we conclude that the trial court failed to apply the proper test for piercing the corporate veil and failed to provide sufficient clarity in its damages award. We, therefore, remand the matter to the trial court for the entry of an order consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Joseph Paul Weyant, Nashville, Tennessee, for the appellants, Robert Snyder and The Tactical Edge, LLC.

Kristin Fecteau Mosher, Nashville, Tennessee, for the appellees, Darrin Numbers and Jude Wilder-Roberts.

# MEMORANDUM OPINION[1]

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from a series of payments made by Darrin Numbers and his mother, Jude Wilder-Roberts (collectively, "Plaintiffs"), to The Tactical Edge, LLC ("TTE"), which was controlled by its managing member, Robert Snyder (collectively, "Defendants"). At the time of these payments, Mr. Numbers was employed by TTE, a retail store formed by Mr. Snyder in 2014 that is located in Clarksville, Tennessee, and specializes in firearms, tactical gear, and equipment.

In April 2020, Plaintiffs filed a complaint[2] in the Montgomery County Circuit Court against TTE and Mr. Snyder, alleging that Plaintiffs had made several loans to TTE that TTE had failed to repay. The complaint set out claims for intentional misrepresentation against Mr. Snyder, conversion against both defendants, and unjust enrichment and breach of contract against TTE. The complaint also sought to pierce the corporate veil to allow Plaintiffs to reach Mr. Snyder on the claims against the LLC. Plaintiffs sought punitive damages against Mr. Snyder and an award of prejudgment interest.

The complaint alleged that, in 2015, Mr. Numbers was working at TTE and agreed to make several loans to the business, in return for which he was to receive a 30% ownership interest. Plaintiffs also alleged that the loan was to be repaid within one year. In total, Mr. Numbers alleged that he had loaned TTE $421,000. Plaintiffs further alleged that, in 2015, Mr. Snyder approached Ms. Wilder-Roberts requesting funding to allow TTE to purchase another business, the "Eagle Creek Armory," and that Ms. Wilder-Roberts then tendered a $300,000 check to TTE. According to the complaint, the funds were not used to purchase Eagle Creek Armory. Instead, the funds were used to purchase a parcel of land in Kentucky, to pay Mr. Snyder, and for other projects. Plaintiffs then alleged that Mr. Numbers requested repayment of his loans and that Mr. Snyder paid Mr. Numbers a lump sum of $20,000 and then began making monthly installment payments. However, the loan repayments later stopped, and Mr. Numbers ceased working at TTE.

---

[1] Rule 10 of the Rules of the Court of Appeals provides:

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2] Plaintiffs originally filed this case in 2015, then voluntarily dismissed it from state court and refiled in federal court. After the federal claims were resolved, because the court's supplemental jurisdiction had not been invoked, the federal court lost jurisdiction over the state law claims and dismissed them. Plaintiffs then refiled the case in state court in 2020.

On July 7, 2020, Defendants filed their answer, denying the allegations contained in the complaint and asserting the affirmative defense that all or part of the transfers were gifts. After several delays, a bench trial on the matter was held over August 26-28, 2024. On September 19, 2024, the court entered a memorandum and final order. After both parties filed motions to alter or amend the judgment, the court entered an amended final order on February 24, 2025.[3] In the amended final order, the trial court made the following relevant findings of fact: in 2014, Mr. Numbers was a frequent customer of TTE and had become close friends with Mr. Snyder. Mr. Numbers was recently divorced and had received a sizeable portion of assets, but he was not employed. Mr. Snyder offered Mr. Numbers a job at $10 per hour, and Mr. Numbers began working at TTE in August 2015. When Mr. Numbers began working at TTE, the court found, Mr. Snyder falsely announced to other staff members that Mr. Numbers would be TTE's chief financial officer ("CFO").

The court then detailed the transfers Mr. Numbers had made to TTE, all of which came from Mr. Numbers's investment account. A printout of the account was introduced at trial showing $421,000 transferred directly from the account to TTE. However, no other writings documented the transfers. At some point, Mr. Numbers and Mr. Snyder began discussing TTE being "an investment opportunity" for Mr. Numbers, and Mr. Numbers then began transferring money to TTE. The first transfer was in June 2015 for $93,000, $25,000 of which was to be used for inventory purchases, with the remainder to be used to purchase a motorhome for TTE and to save on interest by foregoing a loan. However, the court found that a loan for the motorhome was listed on TTE's tax returns, and the motorhome was not paid for with the transferred funds. Then, in August 2015, Mr. Numbers transferred $25,000 to TTE for "research and development purposes." In September 2015, Mr. Numbers made two transfers to TTE: $14,000 for a piece of firearm manufacturing equipment and $50,000 for a point-of-sale computer system. Finally, in October 2015, Mr. Numbers made three transfers to TTE: $160,000 for a proposed new store location and $14,000 and $65,000 for further inventory purchases.

In December 2015, TTE was planning to purchase the Eagle Creek Armory, and Mr. Snyder again approached Mr. Numbers to request money. However, Mr. Numbers no longer had anything to give, so he suggested Mr. Snyder speak to his mother, Ms. Wilder-Roberts. That month, Mr. Snyder met with Ms. Wilder-Roberts to discuss her becoming an investor for the project. After this meeting, Ms. Wilder-Roberts gave Mr. Snyder a $300,000 check to purchase Eagle Creek Armory; however, the purchase was never made. Instead, Mr. Snyder purchased 20 acres of land in Kentucky for $70,400, with TTE keeping the rest.

---

[3] In their motion to alter or amend the judgment, Defendants asserted that the trial court had improperly imposed punitive damages by failing to bifurcate the trial. The trial court agreed with Defendants and held a hearing on whether to impose punitive damages on February 4, 2025. In their motion to alter or amend the judgment, Plaintiffs requested that the trial court amend the order to address their request for prejudgment interest.

Based upon these findings, the court determined that Mr. Snyder had committed fraudulent or intentional misrepresentation by inducing Plaintiffs to transfer money to TTE and that he had made several false statements that Plaintiffs had reasonably relied upon. The court found that Mr. Snyder had also committed promissory fraud. As a result of these actions, the court found Mr. Numbers suffered damages in the amount of $383,341.30 and Ms. Wilder-Roberts suffered damages in the amount $300,000. The trial court next determined that it was appropriate to pierce the corporate veil so that the judgments against TTE would also be against Mr. Snyder individually. On Plaintiffs' conversion claim (against both defendants), the court found that Defendants had converted the funds because, without Plaintiffs' consent, they used the money for purposes other than the agreed-upon uses. On the unjust enrichment claim (against TTE), the court found that Defendants had been unjustly enriched based upon the transfers from Plaintiffs. Lastly, the court determined that an award of punitive damages was appropriate and awarded each plaintiff $150,000 in punitive damages. The court entered judgment as follows:

> As set forth herein, the court finds that Plaintiff Numbers is entitled to recover a judgment of $383,341.30, plus court costs, prejudgment interest pursuant to Tenn. Code Ann. §47-14-123 against Defendant Snyder and TTE, jointly and severally, based upon the theories of intentional/fraudulent misrepresentation and promissory fraud, conversion, and unjust enrichment. The court pierced the corporate veil thereby making Defendant Snyder personally liable for these judgments agaisnt TTE for which execution may issue, if necessary.

> As set forth herein, the court finds that Plaintiff Wilder-Roberts is entitled to recover a judgment of $300,000.00, plus court costs, prejudgment interest pursuant to Tenn. Code Ann. §47-14-123 against Defendant Snyder and TTE, jointly and severally, based upon the theories of intentional/fraudulent misrepresentation, conversion, and unjust enrichment. The court pierced the corporate veil thereby making Defendant Snyder personally liable for these judgments against TTE for which execution may issue, if necessary.

> Additionally, the court finds that Plaintiffs are awarded a judgment of $300,000.00 in punitive damages and enters a judgment in favor of Plaintiffs Numbers and Wilder-Roberts and against Defendant Snyder and TTE for which execution may issue, if necessary.

Defendants timely appealed and present the following issues for our review:

I.      Whether the trial court erred in its finding against the defendants on the bases of fraud, conversion, and unjust enrichment.

II.     Whether it was error for the trial court to pierce the corporate veil in this case, and in the awarding of punitive damages against these defendants.

STANDARD OF REVIEW

We review a trial court's findings of fact de novo upon the record accompanied by a presumption of correctness, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*, 652 S.W.3d 802, 812 (Tenn. Ct. App. 2021). We review the court's decisions on questions of law de novo without any presumption of correctness. *Orrick v. Bestway Trucking Inc.*, 184 S.W.3d 211, 216 (Tenn. 2006).

Many of the court's decisions in this case turn on its assessments of witness credibility. Because "trial courts are able to observe witnesses as they testify and to assess their demeanor," they are "best situate[d] . . . to evaluate witness credibility." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Therefore, we give "'considerable deference'" to a trial court's factual findings in matters where it "heard conflicting in-court testimony and issues of credibility are involved." *Easley v. City of Memphis*, 699 S.W.3d 268, 270 (Tenn. 2024) (quoting *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013)). Therefore, we require "'clear evidence to the contrary'" to reverse a trial court's credibility-based factual findings. *Id.* (quoting *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023)). "This deference must be given to a trial court's express credibility determinations and those implied in its holdings." *Id.*

ANALYSIS

I.      Intentional misrepresentation claims against Mr. Snyder

The trial court found Mr. Snyder liable for intentional misrepresentation, which he asserts was error. This is so, he asserts, because Plaintiffs' reliance on his statements was not reasonable. For the following reasons, we find no merit in Mr. Snyder's argument.

In Tennessee, "'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action." *Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012) (quoting *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999)). The Tennessee Supreme Court has suggested that courts refer to this cause of action solely as intentional misrepresentation, *id.* at 342-43, a suggestion we will follow in this opinion. Plaintiffs were required to prove six elements to recover under this cause of action:

> (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the

representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

*Id.* Mr. Snyder's only argument on this issue relates to the requirement contained in the fifth element stated above: that Plaintiffs' reliance on the truth his statements was not justified. As a result, Mr. Snyder has waived any argument related to the other elements.

A plaintiff's justified reliance on the information provided by a defendant is a "key element" in misrepresentation claims, and the plaintiff must prove that his or her reliance was reasonable. *Hunt v. Veropele Nashville I, LLC*, No. M2014-01046-COA-R3-CV, 2015 WL 9946403, at *11 (Tenn. Ct. App. Aug. 18, 2015). Whether a plaintiff was reasonable or justified in relying on the defendant's statements is a question of fact that is entitled to a presumption of correctness. *SecurAmerica Bus. Credit v. Schledwitz*, No. W2012-02605-COA-R3-CV, 2014 WL 1266121, at *21 (Tenn. Ct. App. Mar. 28, 2014). Whether a plaintiff's reliance was reasonable is evaluated by consideration of several factors, including the plaintiff's business expertise; the type of relationship the parties shared— including whether the parties shared a longstanding business or personal relationship; the availability of the relevant information about the misrepresentation; the concealment of the misrepresentation; the opportunity to discover the misrepresentation; which party initiated the transaction; and how specific the misrepresentation was. *Davis v. McGuigan*, 325 S.W.3d 149, 158 (Tenn. 2010); *Abdulsayed v. Hand*, No. M2012-00583-COA-R3-CV, 2012 WL 5577298, at *5 (Tenn. Ct. App. Nov. 14, 2012).

With these elements in mind, we turn to the circumstances of this case. Regarding Mr. Numbers, the trial court found that Mr. Snyder had committed intentional misrepresentation through making the following untrue statements: that Mr. Numbers would receive a 30% interest in TTE; that the money would be used to make certain purchases; that the money for the motorhome purchase was intended to save on interest; and that Mr. Numbers was the CFO of TTE. The court found that Mr. Numbers reasonably relied on these representations because Mr. Snyder, who Mr. Numbers had a close relationship with, made them and because Mr. Numbers believed that TTE would follow through on them. The court also found that Mr. Snyder had concealed his business partner, Joseph Greiner, who was deployed at the time. Further, the court found Mr. Numbers's reliance reasonable because Mr. Snyder represented that "his attorney" would draw up the agreements. Considering the applicable elements, the evidence does not preponderate against the trial court's finding. Mr. Numbers was a retired military veteran and lacked business acumen or expertise. Mr. Numbers testified that he considered Mr. Snyder to be "a brother" and trusted him based upon their shared military experience. Much of the information underlying the misrepresentations was not available to Mr. Numbers, either because it was private financial information of TTE's or because it concerned future

- 6 -

conduct. Further, Mr. Numbers was also led to believe that Mr. Snyder's attorney was drafting the relevant documents. Therefore, we conclude the evidence does not preponderate against a finding of reasonable reliance.

Regarding Ms. Wilder-Roberts, the trial court determined that Mr. Snyder committed intentional misrepresentation through misrepresenting that Mr. Numbers was one of the owners of TTE and that the purchase of Eagle Creek Armory would be "building a legacy for the family," that the money would actually go towards that purchase, that TTE had made a million dollars or more in profit in 2015, that she had to provide the money quickly because "the owner was traveling in town to sign his divorce, liquidate his possessions, and leave the country for good," that she would be repaid in 5 years with 10% interest, and that his attorney was drafting the agreement between them. Again, considering the applicable elements, the evidence does not preponderate against a finding that Ms. Wilder-Roberts's reliance on these statements was reasonable. Ms. Wilder-Roberts and Mr. Snyder had no preexisting relationship, but he was a close friend of her son's. Regarding Mr. Numbers's ownership interest in TTE, Ms. Wilder-Roberts could have questioned Mr. Numbers about this, but the inquiry may have been fruitless, as he was led to believe he would be a 30% owner of the company. Mr. Snyder also wrongly led Ms. Wilder-Roberts to believe his attorney was drafting an agreement setting out the terms. Therefore, the evidence does not preponderate against a finding of reasonable reliance.

On appeal, Mr. Snyder primarily asserts that neither Mr. Numbers nor Ms. Wilder-Roberts acted reasonably because they failed to require written documents. Respectfully, this argument misses the mark because it wrongly focuses on the reasonableness of Plaintiffs' course of conduct, not on whether their reliance on Mr. Snyder's statements was reasonable or justified. Further, it is unclear what effect a writing would have other than further documenting Mr. Snyder's fraudulent behavior. The trial court's determination of this issue relied on the court's finding that Mr. Number's testimony was "highly credible" and that Ms. Wilder-Roberts's testimony was credible. We require clear and convincing evidence to overturn credibility-based factual findings, *Easley*, 699 S.W.3d at 270, and Mr. Snyder has failed to identify any evidence in the record meeting this standard. Mr. Snyder's arguments on this issue are unpersuasive.

Although the fraud claims were not made against TTE, the court stated, without explanation, that these judgments were against both Mr. Snyder and TTE. As will be discussed below, we find the trial court's damages award to be insufficiently clear.

II.     Conversion claims against both defendants

Defendants also assert that the trial court erred in finding that they converted funds. On this issue, Defendants assert that the subject monies were meant as loans and that the trial court similarly found the transfers to be loans. Because of this, Plaintiffs "willingly presented the funds to the Appellant LLC, and there was an expectation on the part of the

Appellees of being paid back." Consequently, according to Defendants, "neither of [Defendants] wrongfully possessed the subject monies," meaning there can be no conversion.[4] We respectfully disagree.

Conversion is an intentional tort, defined as "'the appropriation of another's property to one's own use and benefit, by the exercise of dominion over the property, in defiance of the owner's right to the property.'" *Bowers v. Est. of Mounger*, 542 S.W.3d 470, 485 (Tenn. Ct. App. 2017) (quoting *Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009)). Notably absent from this definition is a requirement that the property be wrongfully possessed. Although not entirely clear, we discern Defendants' argument to be that, because Plaintiffs willingly transferred the money to TTE, there can be no conversion. This argument fails because it is not the mere possession of the property that establishes a conversion, but rather the "defiance of the true owner's rights" that establishes a conversion. *Meade v. Paducah Nissan, LLC*, No. M2021-00563-COA-R3-CV, 2022 WL 2069160, at *5 (Tenn. Ct. App. June 9, 2022). Indeed, "[c]onversion does not occur until the 'alleged wrongdoer exercises dominion of the funds in "defiance of the owner's rights."'" *Est. of Ralson ex. rel Ralston v. Hobbs*, No. M2009-02442-COA-R3-CV, 2010 WL 4272692, at *4 (Tenn. Ct. App. Oct. 28, 2010) (quoting *Ralston*, 306 S.W.3d at 223)). Therefore, the fact that a defendant did not come into possession of the subject property wrongfully is insufficient to negate a claim of conversion. Therefore, Defendants' argument on this issue is unavailing.

In the court's damages assessment regarding its finding of conversion, it did not specifically find which defendant converted which funds. Instead, it found both defendants liable for the full conversion. As will be discussed later in this opinion, we find the trial court's damages award to be insufficiently clear.

III.     Unjust enrichment claims against TTE

Defendants challenge the trial court's finding of unjust enrichment. We note that this section of Defendants' brief exhibits the same deficiencies contained in Defendants' prior section. Aside from several lengthy block quotes, Defendants' argument is that all payments were made to TTE, not to Mr. Snyder, who never received possession of the

---

[4] Defendants include several lengthy block quotes in this section of their brief. This does not amount to an argument and including these cases "without any explanation of how they relate to the case or how they support reversal of the trial court's judgment does not meet the requirements of this Court." *MidFirst Bank v. Cole*, No. W2023-00440-COA-R3-CV, 2023 WL 8785890, at *6 (Tenn. Ct. App. Dec. 19, 2023); *see also Tennesseans for Sensible Election Ls. v. Slatery*, No. M2020-01292-COA-R3-CV, 2021 WL 4621249, at *6 (Tenn. Ct. App. Oct. 7, 2021) ("The reasoning in Plaintiff's brief is conclusory and relies mainly on long parenthetical quotes from . . . caselaw. As a result, Plaintiff's brief lacks the necessary explanation of how the cited legal principles apply to the facts in this case."). Despite the deficiencies in their brief, we strive to address Defendants' argument.

funds. Therefore, Defendants assert, Mr. Snyder was not unjustly enriched.[5] As recently stated by our Supreme Court:

> [T]he elements of an unjust enrichment claim are (1) "[a] benefit conferred upon the defendant by the plaintiff", (2) "appreciation by the defendant of such benefit", and (3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (internal quotation marks omitted); *see also Paschall's* [*Inc. v. Dozier*], 407 S.W.2d [150, 154 (Tenn. 1966)]. "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Freeman Indus.*, 172 S.W.3d at 525.

*Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 304-05 (Tenn. 2024).

Defendants' argument that all of the transfers were made to TTE is unavailing because, "a plaintiff need not establish that the defendant received a direct benefit from the plaintiff. Rather, a plaintiff may recover for unjust enrichment against a defendant who receives *any* benefit from the plaintiff if the defendant's retention of the benefit would be unjust." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005. "[A] benefit is any form of advantage that has a 'measurable value including the advantage of being saved from an expense or loss.'" *Coffey v. Coffey*, 578 S.W.3d 10, 25 (Tenn. Ct. App. 2018) (quoting *Freeman Indus.*, 172 S.W.3d at 525)).

Mr. Snyder has received a benefit through the payments to TTE. Regarding the funds provided by Mr. Numbers, the trial court found that Mr. Snyder was enriched by the appreciation in value of the money, favorable tax categorization of the funds by Defendants, inventory purchases paid for with the funds that later provided additional profits to Defendants, and the funds being used to purchase a piece of equipment that is now being used by another company Mr. Snyder owns. Regarding Ms. Wilder-Roberts, the trial court determined that Mr. Snyder had been enriched by using the funds to purchase inventory and the Kentucky property he later sold for a profit.[6]

---

[5] This claim was only pled against TTE. The trial court found both Mr. Snyder and TTE were unjustly enriched. Mr. Snyder does not challenge the court's entry of a judgment against him on this ground. Therefore, we will assume he has conceded that whether he was unjustly enriched was tried by consent. It appears from Defendants' argument on this issue that they do not challenge the trial court's finding that TTE was unjustly enriched.

[6] As will be discussed later in the opinion, if Mr. Snyder was unjustly enriched, this will necessarily impact the trial court's veil piercing analysis.

The trial court found that Mr. Snyder and TTE were both unjustly enriched by the full amount of Plaintiffs' claimed damages. It is unclear from the court's order how it came to this conclusion and what Mr. Snyder's liability was premised on. Additionally, it is unclear how Mr. Snyder and TTE could each be unjustly enriched by the full amount absent veil-piercing. Therefore, on remand the trial court should reconsider its damages award and whether and under what theory Mr. Snyder was liable.

IV.    Piercing the corporate veil

In order to find Mr. Snyder liable for the judgments against TTE on the conversion claims or, potentially, on the unjust enrichment claims, the trial court had to pierce the corporate veil. Defendants assert that this was an error. The trial court analyzed the factors found in *Federal Deposit Insurance Corp. v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984), in reaching its decision to pierce TTE's corporate veil, but our Supreme Court has recently held that piercing the corporate veil requires proof of the three elements set forth in *Continental Bankers Life Insurance Co. of the South. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979). *Youree v. Recovery House of E. Tenn.*, 705 S.W.3d 193, 211 (Tenn. 2025). The trial court's reliance on the *Allen* factors, rather than the *Continental Bankers* elements, was an error of law. *See id.* at 202 (stating that "the elements required to articulate a claim for piercing the corporate veil" is a question of law).

As recently stated by our Supreme Court, "[i]t is axiomatic that a corporation is a distinct legal entity that exists separately from its shareholders, officers, and directors."[7] *Youree*, 705 S.W.3d at 206-07. Therefore, those who own shares in corporations enjoy "limited liability" and will not normally be held liable for the debts of their corporation. *Id.* at 207. This shield is not without limits, and "[c]ourts express this limitation through the doctrine of 'piercing the corporate veil.'" *Id.* A court will pierce the corporate veil when it has determined that "a corporate debt is not merely a debt of the corporation but, in fairness, should be considered the debt of another individual or entity." *Id.*

Courts have similarly found that piercing the corporate veil is appropriate "when the corporation is liable for a debt but is without funds to pay the debt, and the lack of funds is due to some misconduct on the part of the officers and directors." *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 828 (Tenn. Ct. App. 2012) (citation modified). "[C]ourts may pierce the corporate veil to find the 'true owners of the entity' liable, or 'to impose liability against a controlling shareholder who has used the corporate entity to avoid his legal obligations.'" *Id.* (citation modified). Courts may disregard the corporate entity when it has been shown that it is "a sham or dummy" or that doing so is "necessary to accomplish

---

[7] Like the businesses in *Youree*, TTE is a limited liability company. After acknowledging that this Court has applied the same standards for piercing the corporate veil to LLCs as to corporations, our Supreme Court stated that, "for purposes of the issues in this appeal, our discussion applies even though the business entities here are limited liability companies." *Youree*, 705 S.W.3d at 207 n.9. Therefore, although TTE is an LLC, we will apply the same standards as if it were a corporation.

justice." *Id.* "Piercing the corporate veil is an equitable doctrine, commonly said to be used to prevent injustice." *Youree*, 705 S.W.3d at 207. Our Supreme Court has cautioned, however, that courts should presume corporate separateness and "give substantial weight to the presumption." *Id.* Therefore, veil piercing "should be the exception, not the rule" and doing so should be "difficult." *Id.* at 207-08. Veil piercing is an equitable matter, *id.* at 207, and "in all events, the equities must substantially favor the party requesting relief, and the presumption of the corporation's separate identity should be set aside only with great caution." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 215 (Tenn. 2012) (citation omitted).

In *Youree*, our Supreme Court clarified the standard for piercing the corporate veil, regardless of whether in the context of a parent-subsidiary relationship or a corporation-shareholder relationship. *Youree*, 705 S.W.3d at 211. As stated in *Youree*, for a court to pierce the corporate veil, three elements must be proven:

> (1) Control over the entity, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the entity, as to that transaction, had no separate mind, will, or existence of its own;
> (2) The control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or to commit a dishonest and unjust act in contravention of a third party's rights; and
> (3) The control and fraud, wrong, violation, or injustice must have proximately caused the injury or unjust loss complained of.

*Id.* (citing *Cont'l Bankers*, 789 S.W.2d at 632).[8] Establishing each of the elements depends "on a combination of circumstances,"[9] and "the conditions under which the corporate form will be disregarded vary according to the unique circumstances of the individual case." *Id.* at 211-12 (citing *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)).

Regarding the first element, the evidence presented supports a finding that TTE was entirely under Mr. Snyder's control.[10] Proof of this element is not merely of domination in

---

[8] The *Youree* opinion recognized that this framework derives from the work of scholar Frederick J. Powell and cited numerous secondary sources to support its reasoning. *See Youree*, 705 S.W.3d at 207-09 (citing Stephen B. Presser, *Piercing the Corporate Veil*, Westlaw (database updated Dec. 2025); Cathy S. Krendl & James R. Krendl, *Piercing the Corporate Veil: Focusing the Inquiry*, 55 DENV. L. J. 1, 1 (1978)). We will draw on the same sources to assist in deciding the issues in this case.

[9] It has also been stated that the elements, though listed separately, tend to overlap factually and in practice." *See* Presser, *supra*, § 1:6 (noting that the three elements "have a tendency to merge into each other").

[10] Powell's list of considerations that are helpful to determining whether this first element has been proven, as phrased by Professor Presser, includes:

general, *see* Krendl & Krendl, 55 DENV. L. J. at 16, but rather that there was "control over the entity, not only of finances, but of policy and business practice in respect to the transaction under attack." *Youree*, 705 S.W.3d at 211. TTE was an LLC with two members; however, Mr. Synder exercised complete control of TTE. As the trial court found, TTE did not follow any corporate formalities, and "there were never any annual meetings, voting, minutes, or the like," and Mr. Snyder did not include his business partner in any decision-making. Mr. Snyder repeatedly acted unilaterally on behalf of TTE without regard to any corporate separateness. For all intents and purposes, it appears Mr. Snyder and TTE were essentially one and the same. This is equally true in the context of the transactions at issue in this case. Therefore, we conclude that the first *Continental Bankers* element has been proven.

We similarly conclude that the second element, whether the control was used to perpetrate the fraud or wrongdoing, was sufficiently proven.[11] Once it has been found that

---

a) Does the parent own all or most of [the] stock of the subsidiary?
b) Do the parent and subsidiary corporations have common directors or officers?
c) Does the parent corporation finance the subsidiary?
d) Did the parent corporation subscribe to all of the capital stock of the subsidiary or otherwise cause its incorporation?
e) Does the subsidiary have grossly inadequate capital?
f) Does the parent pay the salaries and other expenses or losses of the subsidiary?
g) Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent?
h) Is the subsidiary described by the parent (in papers or statements) as a department or division of the parent or is the business or financial responsibility of the subsidiary referred to as the parent corporation's own?
i) Does the parent use the property of the subsidiary as its own?
j) Do the directors or executives fail to act independently in the interest of the subsidiary, and do they instead take orders from the parent, and act in the parent's interest?
k) Are the formal legal requirements of the subsidiary not observed?

Presser, *supra*, § 1:6. Although some of these considerations are not applicable to the present case because TTE is an LLC with only two members, they provide useful context for when the required "domination" has been established.

[11] On this element, Professor Presser phrases Powell's factors as including "a general grab-bag category of 'other cases of wrong or injustice'" and:

a) Did the parent's use of the subsidiary amount to actual fraud?
b) Did the parent use the subsidiary to violate a statute?
c) Did the parent strip the subsidiary of its assets?
d) Did the parent use the subsidiary to engage in misrepresentation?
e) Should the doctrine of estoppel be invoked because of the parent's conduct in using the subsidiary?
f) Did the parent use the subsidiary to commit a tort?

Presser, *supra*, § 1:6.

a subsidiary was a mere instrumentality in a particular transaction, the next question is whether the parent's domination or control has been used to "commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or to commit a dishonest and unjust act in contravention of a third party's rights." *Youree*, 705 S.W.3d at 211 (citing *Cont'l Bankers*, 578 S.W.2d at 632); *see also* Krendl & Krendl, *supra*, at 18. Merely being an instrumentality of the parent is insufficient, and the test contemplates situations where an entity meets that threshold, but that "there was no improper intent on the part of the shareholder nor any injurious result." Krendl & Krendl, *supra*, at 18. As a result, "improper purpose must be established before the parent or other dominant party can be found liable." *Id.* Indeed, "that a corporation has been used for such an improper purpose that equity will permit its corporate form to be disregarded" has been described as "[t]he heart of most corporate veil cases." *Id.* at 28.

Mr. Snyder has used his control over TTE by using the loans to TTE as his personal funds. "The diversion of corporate assets for personal use has frequently been an important factor in decisions piercing the corporate veil." 114 AM. JUR. 3D *Proof of Facts* 403 § 14 (2010). All of the transfers of funds were made to TTE directly—Mr. Numbers transferred money from his investment account to TTE, and Ms. Wilder-Roberts wrote a check to TTE. However, these funds always made their way to Mr. Snyder, either directly or to related entities he controlled. The trial court found that Mr. Snyder "took cash from the ATM for his own use, ate meals at the expense of the company during 2015, and took unauthorized distributions from the LLC." Mr. Snyder also removed assets purchased by TTE with Mr. Numbers's loans for use in a different business formed by Mr. Snyder. The court also found that Mr. Snyder has reported the loans to the government in a manner that resulted in favorable tax treatment to him. From this, we conclude that Mr. Snyder used his control over TTE to perpetuate his fraud on Plaintiffs.

However, problems arise in our consideration of whether the third element, that "the control and fraud, wrong, violation, or injustice must have proximately caused the injury or unjust loss complained of," was sufficiently proven. "The final leg of the Powell rule is that not only must the plaintiff show instrumentality and an improper purpose, but he must also show that both the control by the parent and the improper act of the subsidiary have caused him some direct damage." Krendl & Krendl, *supra*, at 21. "Thus, the third leg of the Powell rule serves to support the policy of limited liability by permitting the piercing of the corporate veil only where equity strictly requires that a particular defendant by reason of that defendant's wrongful acts has caused injury to the plaintiff." *Id.* at 22.

Proximate cause is often found to be lacking in cases where the complaining party "has an adequate remedy without resort to the doctrine of piercing the corporate veil." 114 AM. JUR. 3D *Proof of Facts* 403 § 17 (2010). Indeed, it has been argued that "proximate cause may be lacking either because the complainant has not been injured by the domination of the corporation or because the complainant has an adequate remedy without

resort to the corporation." Krendl & Krendl, *supra*, at 21 n.73.[12] Not piercing the corporate veil when there is an alternative remedy also aligns with our Supreme Court's statement that this doctrine is "commonly said to be used to prevent injustice," *Youree*, 705 S.W.3d at 207, since, where there is an adequate remedy without resorting to piercing, no injustice will result from the failure to pierce. Additionally, courts pierce the corporate veil in situations where "a corporate debt is not merely a debt of the corporation but, in fairness, should be considered the debt of another." *Id.*

Because proximate cause may be broken if a plaintiff has another remedy without resort to piercing the corporate veil, this element is necessarily intertwined with the court's damages assessment. Unfortunately, as will be discussed below, the court's damages assessment in this case is insufficient.

V.      Punitive damages

Next, Defendants challenge the trial court's award of $150,000 in punitive damages to each plaintiff. Defendants' argument on this issue follows the trend set in the preceding sections and consists of long block quotes of caselaw followed by exceedingly minimal argument (in this section, a total of three sentences). Although conclusory, Defendants' argument is that "no cause of action rising to the level of punitive damages can be found in our set of facts." We disagree.

An award of punitive damages is meant to "'punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him.'" *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009) (quoting *Huckeby v. Spangler*, 563 S.W.2d 555, 558-59 (Tenn. 1978)). Punitive damages are only appropriate in the most egregious cases. *Id.* (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992)). Therefore, a plaintiff seeking punitive damages must prove by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. Tenn. Code Ann. § 29-39-104(a)(1); *Goff*, 297 S.W.3d at 187. Clear and convincing evidence leaves "no serious or substantial doubt about the correctness of the conclusions drawn." *Hodges*, 833 S.W.2d at 901 n.3. Whether the record contains clear and convincing evidence to support the trial court's imposition of punitive damages is a question of law. *White v. Empire Express Inc.*, 395 S.W.3d 696, 721 (Tenn. Ct. App. 2012).

---

[12] Examples of when "resort to the corporation" is not necessary, thus precluding a finding of proximate cause, include "[a]cceptance by the complainant of the relationship between the parent and subsidiary, independence of the subsidiary when the obligation to complainant arose, availability of the subsidiary for redress, and, according to Powell, the unresolved situation where the subsidiary is financially able to satisfy a judgment." Krendl & Krendl, *supra*, at 21 n.73.

The record contains clear and convincing evidence that Mr. Snyder acted fraudulently.[13] As to Mr. Numbers, Mr. Snyder fraudulently induced him to transfer $421,000 to Mr. Snyder through false promises and misleading statements. Similarly, as to Ms. Wilder-Roberts, Mr. Snyder fraudulently induced her to transfer $300,000 to TTE. In total, Mr. Snyder defrauded Plaintiffs out of $721,000 and, after making a few repayments, refused to pay Plaintiffs.

VI.    The court's judgment and award of damages

Although we find no merit in most of the Defendants' challenges to the factual findings and legal conclusions of the trial court, the trial court's damages award is problematic and precludes complete review by this Court. The trial court's judgment was entered jointly and severally against both defendants without apportioning liability. Throughout the order, the trial court found both defendants fully liable for the full judgment. The fraud claims were asserted only against Mr. Snyder, and the trial court provided no basis for holding the LLC liable for Mr. Snyder's fraudulent acts. Any damages for fraud, including the punitive damages, should be applicable only to Mr. Snyder. As mentioned above, the court's assessment of damages on the conversion claims did not specify the funds converted by each defendant. With respect to the unjust enrichment claims, which were asserted against TTE only, Mr. Snyder's liability likely depends on piercing the corporate veil. We are unable to discern from the court's order how it calculated its damages award on the various claims against each defendant. Therefore, we vacate the court's order and remand with instructions to enter an order making sufficient findings regarding damages. The trial court will similarly need to reconsider its veil-piercing analysis based on the appropriate test.

CONCLUSION

The judgment of the trial court is vacated and remanded. Costs of this appeal are assessed against the appellants, Robert Snyder and The Tactical Edge, LLC, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[13] The trial court's punitive damages award was also entered against TTE. However, Plaintiffs only sought punitive damages against Mr. Snyder, and the trial court only analyzed Mr. Snyder's conduct. Therefore, we cannot discern upon what basis the trial court awarded punitive damages against TTE. Our decision to vacate and remand the matter to the trial court necessarily gives the court an opportunity to reconsider its punitive damages award against TTE.